**The CITY OF EL PASO, Appellant,**

v.

**Javier ZARATE and Maria Zarate, Individually and on Behalf of All Statutory Wrongful Death Beneficiaries of Sergio Zarate and Ricardo Zarate, Minors, Deceased, Appellees.**

No. 08–95–00031–CV.

Court of Appeals of Texas, El Paso.

Jan. 4, 1996.

Rehearing Overruled Feb. 7, 1996.

David C. Caylor, City Attorney, Laura P. Gordon, Asst. City Attorney, El Paso, for Appellant.

Evelina Ortega, Caballero & Ortega, L.L.P., El Paso, John C. Schwambach, Jr., El Paso, for Appellees.

Before BARAJAS, C.J., and LARSEN and McCLURE, JJ.

## OPINION

BARAJAS, Chief Justice.

This is an appeal from a wrongful death suit stemming from the drowning of Appellees' two sons on property owned by Appellant. The jury found Appellant to be negligent and entered judgment in favor of Appellees in the amount of $500,000. We affirm the judgment of the trial court.

### I. SUMMARY OF THE EVIDENCE

On July 8, 1988, Ricardo and Sergio Zarate, who were thirteen and fourteen years old respectively, were playing in the house with their two cousins. Javier and Maria Zarate, the Zarate children's parents, decided to go to Juarez, Mexico to do some shopping. Before leaving, Maria gave her sons and nephews permission to go to the neighborhood park that was across the street from their house. Maria did, however, instruct the children to stay away from "the lagoon," referring to the northeast ponding area situated across the street from the Zarate home and in close proximity to the neighborhood park. No fences, barricades, or signs separated the park from the ponding area.

Early that evening, but while there was still daylight, Sergio, Ricardo, and their two cousins went into the ponding area that contained a lot of water because of high rainfall over the previous few days. Sergio, who could not swim, was walking close to the edge of the water when he slipped and fell into a washout approximately six and one-half to seven feet deep. Because the walls were very steep, Sergio could not crawl out. Ricardo, who also could not swim, jumped in to help his brother. Tragically, the two boys could not extricate themselves from the muddy water, and they drowned. The ponding area where the boys drowned was not fenced nor posted indicating its ownership, warning of trespass, or admonishing of danger.

In 1984, a strikingly similar event occurred in the ponding area. Chris Jennings, who was eight years old at the time, had gone into the ponding area to catch frogs when he slipped in the mud and fell into the water. A neighbor, who happened to be walking by the area, saw the child in peril and jumped in and saved the boy. After the child was

revived by CPR, city emergency personnel arrived at the scene. Regarding the incident, Linda Rudd, the child's mother, testified as follows:

Q. What had happened to Chris?

A. He had died and been revived by a neighbor. This is what I understand, you know. I wasn't actually there to see it, that he was not breathing when the guy got him out of the water and that the guy revived him.

Q. When you say "near-drowning," what happened?

A. Well, he drowned, actually, and then the guy gave him CPR or whatever and—and brought him—revived him. And the medical people were with him, like I said, when I—when I got there.

The ponding area, containing approximately 500 acres and owned by Appellant, is a natural low point which had originally drained a large section of Northeast El Paso consisting of between 10,000 and 29,000 acres of land. During the early 1970's, the vicinity around the ponding area began to be developed. Appellant required developers of property adjacent to the ponding area to construct temporary improvements to the ponding area. These improvements consisted of the construction of dirt drainage ditches and an earthen retention basin constructed in the lowest point in the area. As such, the ponding area consists of a dug-out hole with two dirt channels.

Appellees brought suit against Appellant, asserting a cause of action for personal injuries and the wrongful death of their sons. Appellees alleged that the condition of the ponding area was a special defect or, alternatively, a premises defect for which Appellant should be liable. Judgment was entered in favor of Appellees in the amount of $500,000, which precipitated this appeal.

## II. DISCUSSION

Appellant attacks the judgment of the trial court in two points of error, challenging the legal and factual sufficiency of the evidence to support various jury findings and alleging that the trial court erred in entering judgment for Appellees.

■ Appellant's first point of error provides: "The trial court erred, as a matter of law, in entering judgment for Appellees." Appellant does not brief this point separately or provide specific, ascertainable arguments in connection with this point. Thus, we are unable to determine the nature of Appellant's complaint from this multifarious point of error. *See* TEX.R.APP.P. 74(d) (providing that "[a] point is sufficient if it directs the attention of the appellate court to the error about which the complaint is made"). Moreover, it is essential that the complaint on appeal be with regard to specific special issues and not the verdict generally. *Superior Packing, Inc. v. Worldwide Leasing & Fin. Inc.,* 880 S.W.2d 67, 69 (Tex.App.—Houston [14th Dist.] 1994, writ denied); *Liberty Mut. Fire Ins. Co. v. McDonough,* 734 S.W.2d 66, 70 (Tex.App.—El Paso 1987, no writ). Accordingly, we overrule Appellant's Point of Error No. One.

■ In its second point of error, Appellant attacks the legal and factual sufficiency of the evidence supporting various jury findings. In considering a "no evidence" legal insufficiency point, we consider only the evidence that tends to support the jury's findings and disregard all evidence and inferences to the contrary. *Garza v. Alviar,* 395 S.W.2d 821 (Tex.1965); *Texas Tech Univ. Health Sciences Ctr. v. Apodaca,* 876 S.W.2d 402 (Tex.App.—El Paso 1994, writ denied). If there is more than a scintilla of evidence to support the questioned finding, the "no evidence" point fails. *Tseo v. Midland Am. Bank* 893 S.W.2d 23, 25 (Tex.App.—El Paso 1994, writ denied); *Hallmark v. Hand,* 885 S.W.2d 471, 474 (Tex.App.—El Paso 1994, writ denied).

■ A factual insufficiency point requires us to examine all of the evidence in determining whether the finding in question is so against the great weight and preponderance of the evidence as to be manifestly unjust. *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660 (1951); *Tseo,* 893 S.W.2d at 25–26; *Hallmark,* 885 S.W.2d at 474. The reviewing court cannot substitute its conclusions for those of the jury. If there is sufficient competent evidence of probative force

to support the finding, it must be sustained. *Tseo,* 893 S.W.2d at 26; *Texas Tech Univ. Health Sciences Ctr.,* 876 S.W.2d at 412. It is not within the province of this Court to interfere with the jury's resolution of conflicts in the evidence, or to pass on the weight or credibility of the witnesses' testimony. *Benoit v. Wilson,* 150 Tex. 273, 239 S.W.2d 792, 796 (1951); *Southwest Airlines Co. v. Jaeger,* 867 S.W.2d 824, 829–30 (Tex. App.—El Paso 1993, writ denied). Where there is conflicting evidence, the jury's verdict on such matters is generally regarded as conclusive. *Montgomery Ward & Co. v. Scharrenbeck,* 146 Tex. 153, 204 S.W.2d 508, 512 (1947); *Tseo,* 893 S.W.2d at 26; *Hallmark,* 885 S.W.2d at 474.

■ In its Point of Error No. Two(a), Appellant alleges that there is legally and factually insufficient evidence to support the jury's finding that the decedents were licensees. Appellant contends that the children entered the ponding area for purposes purely their own and, as such, were ordinary trespassers.[1] We disagree.

■ A trespasser is one who "enters upon the property of another without any right, lawful authority, or express or implied

invitation, permission, or license, not in the performance of any duty to the owner ... but merely for his own purposes, pleasure or convenience...." *Texas–Louisiana Power Co. v. Webster,* 127 Tex. 126, 91 S.W.2d 302, 304 (1936) (quoting 45 C.J. 740). It has long been the law in Texas that a landowner or premises occupier owes to a trespasser only the duty not to injure him willfully, wantonly, or through gross negligence. *Burton Constr. & Shipbuilding Co. v. Broussard,* 154 Tex. 50, 273 S.W.2d 598, 603 (1954); *Smither v. Texas Utils. Elec. Co.,* 824 S.W.2d 693, 695 (Tex.App.—El Paso 1992, writ dism'd by agreement); *Weaver v. KFC Management, Inc.,* 750 S.W.2d 24, 26 (Tex.App.—Dallas 1988, writ denied); *Amara v. Lain,* 725 S.W.2d 734, 738 (Tex.App.—Fort Worth 1986, no writ); *Mendoza v. City of Corpus Christi,* 700 S.W.2d 652, 654 (Tex.App.—Corpus Christi 1985, writ ref'd n.r.e.). A clear description of the policy and law regarding trespassers is provided in *Baldwin v. Texas Utils. Elec. Co.,* 819 S.W.2d 264, 266 (Tex. App.—Eastland 1991, writ denied):

It has long been the law in Texas that a landowner has no obligation to maintain his premises in a safe condition for strangers entering without authorization. The

1. Appellant relies on *City of San Benito v. Cantu,* 831 S.W.2d 416 (Tex.App.—Corpus Christi 1992, no writ), for its assertion that the decedents were trespassers. We find *Cantu* factually distinguishable from the case at bar.

In *Cantu,* the City of San Benito appealed from a judgment entered in a wrongful death suit arising from the drowning death of seven-year-old Calixtro Cantu, Jr. The Cantus originally filed suit against the City of San Benito ("the City") and Cameron County Irrigation District No. 2 ("the District"). The Cantus settled with the District before trial and the cause against the District was severed from the cause against the City.

The resaca where Calixtro drowned is a reservoir located between West Robinson and West Zaragosa Streets in San Benito, Texas. A bridge on West Robinson Street crossed the resaca and the City had a right-of-way for the bridge. Under the bridge were the resaca's floodgates, with four large pipes controlling the flow of water. Calixtro's body was found lodged underneath the pipes under the bridge.

The District owned the land in the recreation area abutting the resaca, but leased it to the City for use as a park. The park, maintained by the City, was free and open to the public. The City's lease began at the water's edge and stretched to

the meander line boundaries of the park. According to the Cantu's witness, the District's responsibility began at the edge of the water and extended into the resaca and the City's responsibility extended from the water's edge on the westerly line of the resaca meander line or resaca property line. It is undisputed that the District, *not the City,* owned, operated, and maintained the resaca.

In *Cantu,* the Court, in reversing and rendering judgment in favor of the City, found that Calixtro was a licensee to whom the City had no duty to warn of the dangerous conditions. *Id.* at 425. Central to this finding, however, was the fact that "[t]he drowning ... did not occur on premises owned, occupied or controlled by the City." *Id.* at 425. The court further noted that "(I)n order to predicate a duty to warn of hazards under a theory of premises liability, it is required that the governmental entity own, occupy or control the premises where the incident made the basis of suit occurred." *Id.; see Marshbank v. Austin Bridge Co.,* 669 S.W.2d 129, 133 (Tex.App.—Corpus Christi 1984, writ ref'd n.r.e.). In contrast, in the case at bar, it is undisputed that Appellant owns, maintains, and controls the ponding area. Because of this significant factual distinction, we do not find *Cantu* to be controlling.

landowner may assume that persons will not penetrate his boundaries uninvited. Trespassers must take the premises as they find them, and, if they are injured by unexpected dangers, the loss is their own.

 In comparison, a licensee "is a person who goes on the premises of another merely by permission, express or implied, and not by any express or implied invitation." *Webster*, 91 S.W.2d at 306; *see Smith v. Andrews*, 832 S.W.2d 395, 397 (Tex.App.— Fort Worth 1992, writ denied) (noting that consent to enter may be express or implied). A licensee's presence on the premises is for his own convenience or on business for someone other than the owner. *Smith*, 832 S.W.2d at 397; *Mendoza*, 700 S.W.2d at 654. The duty owed to a licensee is not to injure the person willfully, wantonly, or through gross negligence and to warn of or make safe dangerous conditions known to the possessor of the premises. *Lower Neches Valley Auth. v. Murphy*, 536 S.W.2d 561, 563 (Tex.1976); *Smither*, 824 S.W.2d at 695; *Weaver*, 750 S.W.2d at 26; *Mendoza*, 700 S.W.2d at 654.

A review of the record reveals sufficient competent evidence showing that Appellant was aware of the use of the ponding area by numerous persons and that Appellant gave its implied permission to use the area. Antonio Santovena, a city employee and the Appellant's chief planner from 1985 to 1989, testified as follows regarding people coming onto the property:

Q. Now, the City was aware, you were aware, that there was (sic) people that were coming to this desert area and that they were removing dirt.

A. Yes.

Q. And this was something that was taking place over a long period of time.

A. Yes.

Q. There was removal of dirt by as much as a truck or truckloads being removed?

A. Yes.

Q. Now—

A. Usually one truckload, not truckloads.

Q. Did you actually watch the people to see whether it was one or two?

A. I never caught anybody.

Q. Okay. But you knew that there was (sic) trucks of dirt being removed from that area.

A. Yes.

Q. People were getting on the area and the City was aware of it?

A. Yes.

Tony Conde, Appellant's consulting engineer on the ponding area, noted that removal of the dirt was "free gratis" because any excavation of dirt would produce additional capacity for ponding. Mr. Conde further asserted that there were dirt roads in the ponding area and that "in the early years, that was a good duck-hunting area, because water accumulated there and people went out there and drove all over the place for recreational purposes." Mr. Barreras testified as follows regarding the use of the ponding area by members of the community:

Q. What was the area like, the desert area?

A. That particular area?

Q. Yes, sir.

A. It was a—it was a desert when it was—when it was dry and had a big hole in the middle of it. It's a large desert area. But when it rains, it gets—that whole area gets flooded, and there's different—whole bunch of washouts all over the place where it gets full of water. And that's a park that's close to that area and that the kids, when they get off of school, or in the summer in particular—

. . . . .

Q. Go ahead.

A. Okay. It's—all the kids are attracted to the area because it's—you can see there's that housing area there. And if I can point this out?

Q. Sure.

A. Here's the park right here. It's a green area. It's a park. And this is the housing area. And the bus drops the kids off all along this street. So as you can see, here's the water and here's the desert area, and when—it's just a natural attraction. It's a natural attraction for the kids to go over there and play in the water or get close to the water. And they don't

realize, I don't think, how dangerous it can be.

. . . . .

Q. As far as from your observations, then, what would attract the kids to go into the desert?

A. Just a place to ride around, the water. The water in particular.

John DeLeon, a witness to the drowning, testified that he would go to the ponding area to "swim, just mess around up there in the desert." He further noted that children would play in the ponding area when it was dry and climb around in the holes. Finally, and most importantly, four years prior to the incident in question, Appellant had actual knowledge that a child entered the ponding area and nearly drowned. The foregoing testimony concerning Appellant's knowledge that the ponding area was frequently used by persons in the surrounding area provide some evidence to support the trial court's finding that the decedents were licensees and not naked trespassers. Moreover, its clarity and the absence of contradictory evidence lead us to conclude that the trial court's finding was not so against the great weight and preponderance of the evidence as to be manifestly unjust. Accordingly, we overrule Appellant's Point of Error No. Two(a).

▉▉▉ In its Point of Error No. Two(b)(1), Appellant asserts that there is legally and factually insufficient evidence to support the jury's finding that the condition of the ponding area posed an unreasonable risk of harm. We find the evidence sufficient to support both determinations. We note, however, that Appellant's argument consists of one sentence unsupported by citation to any authority. Failure to cite authority in support of a point of error on appeal waives the complaint. *Romero v. Parkhill, Smith & Cooper, Inc.*, 881 S.W.2d 522, 529 (Tex. App.—El Paso 1994, writ denied); *Luker v. Arnold*, 843 S.W.2d 108, 120 (Tex.App.—Fort Worth 1992, no writ); *Malouf v. Dallas Athletic Country Club*, 837 S.W.2d 674, 678 (Tex. App.—Dallas 1992, writ dism'd w.o.j.); TEX. R.APP.P. 74(f). Nevertheless, in the interest of justice, we address Appellant's contentions.

Francois Barreras, the man who pulled the boys from the water, testified that the ponding area was a dangerous place and that the bottom of the ponding area is "made out of this caliche or clay, I guess, and when you step in it, you sink in it and you stick. . . . It has a tendency to stick, like if you have shoes on, pull them right off." He further testified that the ground gave way and "it would crumble and it would—and you would slide on the mud. And then besides the floor being so sticky and stuff, it was very hard to get—get them out of there." Linda Rudd, whose son nearly drowned in a similar incident in the ponding area, testified that the water area was very hazardous and that "the ground was very unlevel, different washed out places from the rains. And—it was real slippery." Finally, John DeLeon, who witnessed the drowning, testified that the ponding area was a dangerous place.

Appellant's expert, a civil engineer, testified that the design, construction, and maintenance of the facility were not contributing factors in the drowning. Similarly, Tony Conde testified that the ponding area was not a dangerous area. Because the testimony presented to the trial court is directly conflicting, we are not the proper body to resolve this issue. As such, we leave this task to the fact finder. Accordingly, we overrule Appellant's Point of Error No. Two(b)(1).

▉▉▉ In its Point of Error No. Two(b)(2), Appellant contends that there is legally and factually insufficient evidence to support the jury's finding that Appellant had actual knowledge of the danger. We find ample evidence in the record to support both determinations.

The most glaring evidence regarding Appellant's knowledge of the danger concerns that of the near-drowning of Chris Jennings in 1984. Linda Rudd testified that, in coming to the rescue of the boy, there was "the Army helicopter, and I believe there was one squad car and two fire engines and one ambulance." We fail to see how Appellant had no knowledge of the danger of the ponding area when police officers, fire fighters, and emergency medical technicians arrived on the scene to assist a boy who nearly

drowned. In contrast, Appellant's testimony concerning its lack of knowledge about the danger consisted of an attempt to discount Ms. Rudd's testimony because she had difficulty identifying the aerial photographs of the ponding area, which admittedly has changed with the forces of nature over time.

Appellant was further apprised of the danger at a meeting with a northeast city representative prior to the drowning.[2] Francois Barreras testified that he told the representative that the ponding area was a potential danger because it gathered a lot of water at certain times. Appellant proffered no contradictory testimony on this issue. The jury's finding that Appellant had actual knowledge of the danger is not manifestly unjust, nor is it against the great weight and preponderance of the evidence. Accordingly, we overrule Appellant's Point of Error No. Two(b)(2).

■ In its Point of Error No. Two(b)(3), Appellant attacks the legal and factual sufficiency of the evidence to support the jury's finding that the decedents did not have actual knowledge of the danger. Appellant's testimony at trial attempted to establish that the decedents had actual knowledge of the danger because they could not swim and knew that if they fell into the water, they could drown. Appellant also brought forth testimony from the boys' parents which established that the boys were warned numerous times to stay away from the area.

A sufficiently analogous issue was addressed in *City of Houston v. Cavazos*, 811 S.W.2d 231 (Tex.App.—Houston [14th Dist.] 1991, writ dism'd). In *Cavazos*, the City of Houston appealed from a judgment entered in a wrongful death suit arising from the drowning death of Edmundo Cavazos on property controlled by the city. The drowning occurred when the Cavazos family decided to cross to the other side of a river by wading across a concrete slab. The slab was covered with murky water that was between a foot and a foot and a half deep. Although the water at the edge of the slab dropped off to a depth of fifteen feet, this drop-off was not visible to the people wading on the slab. In crossing the slab with his family, Edmundo Cavazos slipped, fell, was carried into the deeper water and drowned.

On appeal, the City of Houston argued that Edmundo Cavazos was negligent in crossing the slab because he was a poor swimmer. In rejecting the City of Houston's contention, the court noted that the family had no intention of going swimming on the day of the incident. *Id.* at 236. The court further asserted that "[i]f the boys had planned to go swimming, their inability to swim might have been significant." *Id.* Finally, the court noted that the inability to see the unmarked drop was one of the factors that made the area so dangerous. *Id.* at 237.

In the instant case, there was no evidence that the decedents were planning to go swimming in the ponding area. The fact that the decedents were wearing shoes at the time of the accident further underscores this fact. Thus, we do not find the inability of the boys to swim to be significant. Moreover, we find that the loose soil on the bank, the caliche at the bottom of the water, the muddy water hiding the depth of the washouts, and the steep walls of the embankment which prevented the decedents from crawling out of the water were the factors which made the area so dangerous, not the mere existence of the water at the location. No evidence was

---

**2.** Although Appellant was made aware of the potential for danger in these two incidents, Appellant failed to fence the area, put up barricades, or post the area warning of danger. We do not pass on the issue of whether Appellant should have fenced the area, which might be cost-prohibitive if required in all instances where water accumulates. We note, however, the adequate warning provided by Appellee in *Smither v. Texas Utils. Elec. Co.*, 824 S.W.2d 693, 694 (Tex. App.—El Paso 1992, writ dism'd by agr.), a wrongful death suit stemming from the death of a trespassing fisherman on land owned by Texas Utilities Electric Company (TU). TU placed a number of "no trespassing" signs to the chain link fence surrounding the canal. Other signs located within the fence line proclaimed, "DANGER, KEEP OUT, DEEP WATER–STRONG CURRENT, 'STAY AWAY!' FOR YOUR OWN SAFETY." We recognized in *Smither* that "[t]he fence and the 'no trespassing' signs would have the effect of ensuring that anyone entering the premises would be a trespasser and not a licensee." *Id.* at 696. In the instant case, because Appellant failed to take any of these precautions, we find that the decedents were licensees, as discussed in Point of Error No. Two(a).

presented that the decedents had actual knowledge of any of these dangers. The jury's finding that the decedents did not have actual knowledge of the danger is not manifestly unjust, nor is it against the great weight and preponderance of the evidence. Accordingly, we overrule Appellant's Point of Error No. Two(b)(3).

In its Point of Error No. Two(c), Appellant alleges that there is legally and factually insufficient evidence to support the jury's finding that the City of El Paso was grossly negligent with respect to its conduct involving the design, construction, or maintenance of the ponding area.

Again, as with Point of Error No. Two(b)(1), Appellant has failed to support its argument by citation to any authority, thus waiving any complaint on appeal. Additionally, in addressing Appellant's contentions, we note that the jury received a question on gross negligence which was conditioned upon a finding that the decedents were trespassers. The jury answered question one, finding that the decedents were licensees and, as instructed in the charge, did not answer the gross negligence question. Because the jury made no finding that Appellant was grossly negligent, Appellant's point of error is nonsensical. Accordingly, we overrule Appellant's Point of Error No. Two(c).

Having overruled each of Appellant's points of error, we affirm the judgment of the trial court.