Appellee=s Second Motion for Rehearing Overruled and Second Motion for
En Banc Rehearing is overruled as moot; Reversed and Rendered and Substitute
Majority Opinion and Concurring Opinion filed April 19, 2007








 

Appellee=s Second Motion for Rehearing Overruled and Second
Motion for En Banc Rehearing is overruled as moot; Reversed and Rendered and Substitute Majority Opinion and Concurring
Opinion filed April 19, 2007.

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-04-01133-CV

____________

 

EXXON MOBIL CORPORATION, Appellant

 

V.

 

LOUISE ALTIMORE, Appellee

 



 

On Appeal from the 405th
District Court

Galveston County, Texas

Trial Court Cause No. 03CV0588

 



 

S U B S T I T U T E   M A J O R I T Y  O P I N I O N  ON   R E H E A R
I N G

Appellee, Louise Altimore=s Second Motion
for Rehearing is overruled as moot, our substitute opinion of December 7, 2006
is withdrawn, and the following substitute opinion is issued in its place.[1]








This case presents the issue of whether appellant, Exxon
Mobil Corporation (AExxon@), owes a duty to
an employee=s wife injured by exposure to asbestos brought home on
her husband=s work clothing, at a time when such an injury was considered
a medical curiosity.

Exxon appeals a judgment on a jury verdict in favor of
appellee, Louise Altimore, for damages sustained from contracting mesothelioma
by allegedly breathing asbestos dust brought home on her husband=s work clothes. 
Because, under the facts of this case, we hold Exxon did not owe appellee a
duty, we reverse the judgment of the trial court and render judgment that
appellee take nothing on her claims against Exxon.

Factual Background and Procedural History








Appellee was diagnosed with pleural mesothelioma in April
2003.  Mesothelioma is a rare and almost universally fatal disease.  According
to Dr. Gary Raabe, Exxon=s epidemiologist expert witness, the only
cause of mesothelioma proven by epidemiological studies is asbestos exposure.[2] 
Appellee brought suit against Exxon and a large number of other defendants
alleging her mesothelioma resulted from asbestos exposure for which the
defendants were responsible.  By the time of trial, Exxon was the only
remaining defendant.  Appellee=s husband, Mike Altimore, was a lifetime
Exxon employee.[3] 
Appellee=s complaint
against appellant is that (1) Exxon negligently allowed Mr. Altimore to bring
asbestos dust home on his work clothes; (2) appellee inhaled the asbestos dust
while laundering Mr. Altimore=s asbestos laden work clothes; (3) causing
her to contract mesothelioma.

During trial, Dr. Richard Lemen, appellee=s epidemiologist
expert witness, testified regarding the actual asbestos exposures endured by
the Altimores.[4] 
Initially, Dr. Lemen explained that in order to determine if there are asbestos
fibers in a certain location, one must take air samples and that you Acan=t just eyeball it.@[5]  Dr. Lemen
testified he did not know what Mr. Altimore=s cumulative
asbestos exposure was at Exxon and any attempt to calculate that would be sheer
speculation with a 100 percent error rate.  Dr. Lemen also explained that he
cannot tell what Mrs. Altimore=s exposure to asbestos would have been
from Mr. Altimore=s clothing.  Despite this testimony, Dr. Lemen went on to opine
that (1) because there was evidence  the Exxon Baytown facility used asbestos
containing insulation products, and (2) there was testimony Mr. Altimore
periodically worked in areas where insulators were performing their work, and
(3) there was testimony there was dust visible to the naked eye, he was able to
conclude that Mr. Altimore was exposed to toxic levels of asbestos and, in turn,
he brought toxic levels of asbestos home on his work clothes. 








Dr. Sam
Hammar and Dr. Segarra also testified on behalf of appellee regarding appellee=s exposure to asbestos.[6] 
All three of appellee=s experts explained that mesothelioma is a dose responsive
disease, which means the risk of contracting the disease increases with the
amount of exposure to asbestos.  Dr. Lemen testified that while research has
not yet revealed it, he believes there is a minimum dose required to cause
mesothelioma.  Both Drs. Segarra and Hammar opined that appellee was exposed to
sufficient asbestos from handling Mr. Altimore=s work clothes to cause her
mesothelioma.  Both doctors based their opinions on the history obtained from
appellee and assumptions there would be evidence that Mr. Altimore worked
around asbestos and brought it home on his work clothes.  Both doctors accepted
appellee=s historical evidence of asbestos
exposure at face value.  Dr. Hammar testified that without the history provided
by appellee he had no evidence appellee was exposed to asbestos.  According to
both Drs. Hammar and Segarra, appellees=s history also included potential
exposure to asbestos through the use of household repair products and asbestos
attic insulation.  In Dr. Segarra=s opinion, assuming she had these
household exposures to asbestos, they could, in and of themselves, have caused
her mesothelioma. 

At the
close of the evidence, the case was submitted to the jury as a negligence case
and they returned a verdict finding Exxon acted negligently and with malice. 
The jury awarded appellee $992,901 in actual damages and $992,901 in exemplary
damages.  Given the amount of the settlement credit,[7]
the trial court entered judgment on the jury verdict only for the amount of the
exemplary damages.  Exxon=s post-trial motions for new trial and for remittitur and its
motion to modify the judgment were overruled by operation of law.  This appeal
followed.

Discussion








In eight issues on appeal, Exxon argues the trial court
erred when it entered a final judgment in favor of appellee.  As its first
issue, Exxon asks the question: A[d]id Exxon owe
the plaintiff a duty?@ Within its first issue, Exxon then argues
it did not owe appellee a duty because, Aon the record in
this case, the lack of foreseeability is a proper reason for rejecting a duty.@  Exxon then goes
on to state that Aat no relevant time did medical science
reveal any foreseeable risk to [appellee].@  Because we find
Exxon did not owe appellee a duty during the relevant time period, we need only
address Exxon=s first issue.  Because this issue is dispositive of
this appeal, we do not reach the issue of causation.  Tex. R. App. P. 47.1.

I.        The
Elements of Negligence.

The elements of a negligence claim are the existence of a
legal duty, a breach of that duty, and damages proximately caused by that
breach.  IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason, 143
S.W.3d 794, 798 (Tex. 2003).  Duty is the threshold inquiry in a negligence
case. Centeq Realty, Inc. v. Siegler, 899 S.W.2d 195, 197 (Tex. 1995). 
If there is no duty, liability for negligence cannot exist.  Thapar v.
Zezulka, 994 S.W.2d 635, 637 (Tex. 1999).

II.       The
Standard of Review.








The existence of a legal duty is a question of law for the
court to decide from the particular facts surrounding the occurrence in
question.  Van Horn v. Chambers, 970 S.W.2d 542, 544 (Tex. 1998). 
Because the existence of a duty is a pure question of law, we review the trial
court=s determination of
duty on a de novo basis.  Loram Maint. of Way, Inc. v. Ianni, 141 S.W.3d
722, 727 (Tex. App.CEl Paso 2004), rev=d on other grounds, 210 S.W.3d 593
(Tex. 2006) (citing El Paso Natural Gas Co. v. Minco Oil & Gas, Inc.,
8 S.W.3d 309, 312 (Tex. 1999)).  To determine whether the defendant is under a
duty, we consider several interrelated factors, including the risk,
foreseeability, and likelihood of injury, weighed against the social utility of
the actor=s conduct, the magnitude of the burden of guarding
against the injury, and the consequences of placing the burden on the
defendant.[8]
Bird v. W.C.W., 868 S.W.2d 767, 769 (Tex. 1994); Greater Houston
Transp. Co. v. Philips, 801 S.W.2d 523, 525 (Tex. 1990).  Of these factors,
the foremost consideration is whether the risk is foreseeable.  Greater
Houston Transp. Co., 801 S.W.2d at 525.  Foreseeability means that the
actor, as a person of ordinary intelligence, should have anticipated the
dangers that his negligent act created for others.  Isbell v. Ryan, 983
S.W.2d 335, 339 (Tex. App.CHouston [14th Dist.] 1998, no pet.). 
Foreseeability, however, does not require a person to anticipate the precise
manner in which injury will occur once the person creates a dangerous situation
through his negligence.  Taylor v. Carley, 158 S.W.3d 1, 9 (Tex. App.CHouston [14th
Dist.] 2004, pet. denied).  Foreseeability requires only that the general
danger, not the exact sequence of events that produced the harm, be
foreseeable.  Id.  The Texas Supreme Court has frequently stated a
two-prong test for foreseeability: (1) that the injury be of such a general
character as might reasonably have been anticipated; and (2) that the injured
party should be so situated with relation to the wrongful act that injury to
him or one similarly situated might reasonably have been foreseen.  Mellon
Mortgage Co. v. Holder, 5 S.W.3d 654, 655 (Tex. 1999) (citing Nixon v.
Mr. Property Mgmt. Co., 690 S.W.2d 546, 551 (Tex. 1985)) (plurality
opinion).[9] 
AStated more
broadly, we determine both the foreseeability of the general danger and the
foreseeability that a particular plaintiff - or one similarly situated - would
be harmed by that danger.@  Id.  AProof of
negligence in the air, so to speak, will not do.@ Id. at 656
(citing Palsgraf v. Long Island R. R., 248 N.Y. 339, 162 N.E. 99, 99B100 (1928)).

III.      Was
Appellee=s Injury Foreseeable?

To answer this question, we must determine whether the
evidence introduced at trial  establishes that it was foreseeable to Exxon
that, during the time period relevant to this case, an employee=s spouse was at
risk of contracting a serious illness as a result of inhaling asbestos dust
brought home on the work clothes of her husband, an Exxon employee.

 

 








A.      What is
the Relevant Time Period? 

Mr. Altimore worked as a machinist at Exxon=s Baytown, Texas
refinery between 1942 and 1977.  Mr. Altimore began his career at Exxon working
in the oil refinery, and at some point during his career, he moved to the
polyolefins unit.[10]  
It is undisputed that in 1972, Jesse Stovall made Mr. Altimore the supervisor
of the air-conditioned tool room within the polyolefins unit.  Mr. Altimore
worked in the tool room until he retired from Exxon in 1977.[11]
There was testimony from the various fact witnesses that, before he moved into
the air-conditioned tool room, Mr. Altimore, while performing his duties as an
Exxon machinist, worked in the vicinity of asbestos containing products, was
exposed to visible dust, and went home with dust on his clothing.[12] 
Accordingly, the time period relevant to this inquiry starts in 1942 when Mr.
Altimore went to work in the Baytown refinery, and ends in 1972 when he began
working in the air-conditioned tool room.

 

 








B.      During the
Relevant Time Period, What Did Exxon Know About the Risk of Take-Home Exposure
to Asbestos? 








Dr. Lemen testified that, as of 2004, research had not been able to identify an asbestos
exposure level below which there is no risk for developing cancer.  According to Dr. Lemen, the
Occupational Health and Safety Administration (AOSHA@) issued a statement that it was not
aware of a toxic substance that has more clearly demonstrated detrimental
health effects on humans exposed to such a substance than asbestos.  Dr. Lemen
testified OSHA has determined the diseases caused by asbestos exposure include
asbestosis, lung cancer, and pleural mesothelioma.[13] 
Dr. Raabe explained to the jury the only cause of mesothelioma proven by
epidemiological study is asbestos exposure.  Dr. Jay Segarra, appellee=s pulmonologist expert witness,
testified  housewife bystander asbestos exposure causing mesothelioma, as
alleged by appellee, was an accepted concept in the medical and scientific
literature of 2004.  However, the current understanding of the risks associated
with asbestos exposure is not static, rather it is based on an expanding body
of knowledge acquired over time.  Indeed, over the last century greater
knowledge has gradually accrued with time and extensive international
research.  Dr. Lemen, and to a lesser extent the other expert witnesses in this
case, provided a detailed history of the evolution of the comprehension of the
risks associated with asbestos exposure.  Inasmuch as our decision in this case
rests on the answers to the questions, what did Exxon know about the risks
associated with asbestos exposure, and when did Exxon know it, we examine the
evolution of that knowledge at some length.[14]

1.         Dr. Lemen=s Testimony.








Dr.
Lemen reported there had already been significant advances in asbestos research
by 1942, the year Mr. Altimore went to work at the Baytown refinery.  These
advances included establishing by epidemiological study[15]
that asbestos exposure caused disease, specifically asbestosis.[16] 
Dr. Lemen also reported that by 1942 there had already been case reports in
both Great Britain and the United States linking asbestos exposure with lung
cancer.[17]  The United
States Public Health Service (AUSPHS@) had also become involved in asbestos research by 1942.[18] 
The USPHS had not only reported that prolonged exposure to asbestos dust caused
a pulmonary fibrosis different from silicosis, it had also made recommendations
for dealing with the problems associated with asbestos exposure.  These
included generally controlling the levels of dust containing toxic substances
to prevent the development of the disease, and maintaining a specific level of
asbestos exposure that was thought to be safe: five million particles per cubic
foot.

Dr.
Lemen also reported that Exxon was involved in these early research efforts. 
In 1937, Roy Bonsib, Exxon=s chief safety inspector, published the article ADust Producing Operations in the
Production of Petroleum Products and Associated Activities.@  Bonsib makes it clear Exxon
recognized by 1937, if it was dusty enough to see the airborne particles of
dust, it was not safe for workers to be working in those conditions without
taking safety precautions.  To reduce the risk of workers developing disease,
Bonsib recommended reducing the levels of airborne dust in the workplace and
preventing workers from breathing that dust.  Finally, Bonsib recommended
further studies and prompt adoption of adequate precautionary measures. 
According to several witnesses, Bonsib=s report served as the backbone of
Exxon=s industrial hygiene program for more
than three decades.  The Bonsib report did not, however, address the issue of
the risk of family member bystander exposure.








In 1946,
the American Council of Governmental Industrial Hygienists adopted the five
million particles per cubic foot standard first put out by the USPHS in 1938. 
That same year, the Fleisher-Drinker study of asbestos insulation workers in
United States Navy shipyards during the Second World War was the first major
study involving workers using asbestos products as opposed to workers in
asbestos mines or asbestos product manufacturing plants.  This study concluded
working with asbestos insulation was a safe occupation and the five million
particles per cubic foot standard appeared to be a safe level of exposure.

In 1949
Exxon=s industrial hygienists and safety personnel
prepared a report entitled ASummary of the Plant Industrial Hygiene Problems.@[19]  According to Dr. Lemen, this
confidential Exxon report demonstrates that, based on the scientific literature
of the period, Exxon did not have an awareness there was a risk of developing
lung cancer as a result of asbestos exposure.  Dr. Lemen continued that this
report also shows that by 1949, Exxon had identified categories of refinery
workers at risk for exposure to asbestos and it was not limited to insulators. 
Finally, Dr. Lemen testified that, at that time, while there were many case
reports linking lung cancer and asbestos exposure, there were still no
epidemiological studies making that connection.

In 1955,
Dr. Richard Doll published an epidemiological study in Great Britain that,
according to Dr. Lemen, is credited with establishing the causal relationship
between asbestos exposure and lung cancer.

In 1957,
the state of Texas passed a regulation limiting asbestos exposure to five
million particles per cubic foot for all industries operating in Texas.








In 1960,
Dr. Wagner from South Africa, published ADiffuse Pleural Mesothelioma and
Absestos Exposure in the Northwestern Cape Province.@  Dr. Wagner=s paper established that mesothelioma
is casually associated with asbestos exposure.  That same year,  Dr. Eisenstadt
reported two foremen at a Port Arthur, Texas refinery had developed
mesothelioma.  According to this case report, they were exposed in a refinery
and were using asbestos products.  Dr. Lemen testified that, by 1960, there
were still no epidemiological studies in the United States that connected
asbestos exposure in persons working with asbestos end products, as opposed to
workers actually manufacturing the products, with disease.

In 1964,
the New York Academy of Science held an international conference addressing
asbestos-related disease research.  Papers were presented covering the whole
body of international research concerning asbestos and asbestos-related
diseases.  Exxon personnel attended the meeting and Dr. R. E. Eckardt, an Exxon
medical research department employee, wrote a report for Exxon summarizing the
information presented at the conference.[20] 
Among the papers summarized by Dr. Eckardt was  J. G. Thompson=s case study: AAsbestos in the Urban Dweller.@  According to Dr. Eckardt, Thompson
reported that families of asbestos workers, meaning those working in asbestos
factories or mines, may develop asbestosis from brushing off clothes and those
living near asbestos factories may develop asbestosis or tumors of the lung. 
Dr. Lemen testified that Dr. Eckardt did a good job  summarizing the content of
the meeting when he concluded that minor exposures to asbestos may result in
pulmonary changes.  Dr. Eckardt recommended taking whatever measures were
necessary to control dust exposure to eliminate asbestosis, bronchial
carcinomas, and mesothelioma, all of which seemed to be related to asbestos
exposure. According to Dr. Eckardt, the conference demonstrated that the
growing body of scientific evidence indicated asbestos exposure was a far more
serious problem than had been previously thought, and control measures would
have to be more fully developed than they were in the past.








In 1964
the first epidemiological study of end users of asbestos products was prepared
by doctors I. J. Selikoff, E. C. Hammond, and J. Churg: AThe Occurrence of Asbestosis Among
Insulation Workers in the United States.@  Dr. Selikoff presented this paper
at the 1964 New York conference and it would be included in the book he
published in 1965  containing all papers presented at the conference.  Dr.
Selikoff and his colleagues also presented a second paper at the New York
conference: ANeoplasia Among Insulation Workers.@  These studies examined insulation
workers who were members of the North American Asbestos Worker=s Union.  In these papers, the
authors reported an increased incidence of lung cancer and mesothelioma among
the studies= population and they concluded these diseases appeared to be causally
related to asbestos exposure.  In addition, they reported cancer among people
indirectly exposed to asbestos insulation work, such as carpenters, steam
fitters, and other building trade workers.  According to Dr. Lemen, the authors
questioned whether the Threshold Limit Value (ATLV@) of five million particles per cubic
foot was protective of workers as more than ten percent of the workers in the
studies had died as a result of asbestos related disease.  Finally, Dr.
Selikoff and other participants in the New York conference, called for more
epidemiological studies to establish that asbestosis, lung cancer, and
mesothelioma were causally related to asbestos exposure because there were
still asbestos researchers who doubted there was a connection.

Dr.
William Marr, a shipyard doctor, published a study of shipyard insulators in
the Industrial Hygiene Journal in 1964.  Dr. Marr reported the
insulators were not exposed at levels above the TLV, yet workers were still
contracting asbestos related diseases.  According to Dr. Lemen, the
significance of Dr. Marr=s study to the medical and scientific community was that the
TLV may not be protective of workers.








In 1965,
doctors Selikoff, Hammond, and Churg published ARelation Between Exposure to Asbestos
and Mesothelioma.@  This study concluded mesothelioma was a disease caused by
asbestos in multiple work environments.  Dr. Hammond, of the American Cancer
Society, stated that a only a few years earlier, hardly anyone believed that
insulation workers were at risk for lung cancer as they were only exposed to
asbestos at levels below the TLV.  The researchers held this belief because it
was thought at the time that if you kept exposures below the TLV, you would not
get asbestosis, and if you do not get asbestosis, there would also be no lung
cancer.

Dr.
Lemen testified this growing belief that lung cancer was caused by asbestos
exposure was not universal in 1965.  The previous year, Dr. Schepers, a medical
doctor from South Africa who attended the 1964 New York conference, made a
comment during the conference that was included in Dr. Selikoff=s 1965 book.  Dr. Schepers stated
that, as of 1964, there seemed to be less certainty that asbestos was
associated with lung cancer and that, ultimately, he believed the
carcinogeneity of asbestos would be treated as of low order.

In 1967,
doctors Lieben and Pistawka published a case study reporting that the
daughter of an insulation worker had contracted mesothelioma.  According to Dr.
Lemen, the first reports of take home asbestos exposure being connected with
disease had come out in the 1960's.

Also in
1967, Leroy Balzer, Ph.D. and Clark Cooper, M.D. published AWork Environment of Insulating
Workers.@  This study examined San Francisco,
California insulators who were exposed to asbestos at levels below the TLV who
were still getting asbestos related diseases.  Once again, according to Dr.
Lemen, the significance of this article to the medical and scientific community
was the possibility the TLV did not adequately protect workers.








According
to Dr. Lemen, 1972 was a crucial year in the history of asbestos research.  By
1972, the experts were in agreement, if a person gets enough exposure to
asbestos, that person could get asbestosis and cancer.  Once that central tenet
had been generally accepted, the debate focused on what constituted a safe
level of exposure for workers.  Thus, in June of 1972, OSHA released its
initial asbestos exposure standard: five fibers per cubic centimeter over an
eight hour time-weighted average.  This was the first asbestos exposure
standard to cover all industries on a nationwide basis.  As part of these OSHA
asbestos regulations, employers were prohibited from allowing workers to take
their work clothes home to be laundered if the worker had been exposed to
asbestos.  Also in 1972, while it had insufficient information to issue a
single standard protective of all asbestos related disease, NIOSH proposed an
asbestos exposure standard of two fibers per cubic centimeter.  Both the OSHA
and NIOSH standards were designed to protect primarily against asbestosis. 
Despite the growing knowledge of the risks associated with asbestos exposure,
in 1972, NIOSH performed a Health Hazard Evaluation of the Mobil Oil refinery
in Augusta, Kansas.  This study, published in April 1973, examined  the level
of asbestos exposure for insulation workers in a refinery setting.  The study
concluded that asbestos was not toxic at the concentrations encountered in the
insulators= work.

By 1974,
knowledge of the risks of asbestos exposure reached the point where the doctors
and others involved with asbestos research realized asbestos might pose a risk
beyond the workplace.  In an October 1974 memorandum, Fred Venable, the
industrial hygienist at Exxon=s Baton Rouge refinery, reported that Exxon=s failure to require the use of
coveralls by employees and laundering by Exxon violated OSHA regulations and
threatened employees and employees= families.  Venable also stated Exxon
had previously been complacent when addressing asbestos issues but there had
been a change in thinking since the appearance of two cases of mesothelioma among
Exxon employees.  Two years later, in 1976, the USPHS announced there was no
safe dose for asbestos exposure.  That same year, the year before Mr. Altimore
retired from Exxon, Dr. Selikoff and his research colleagues published an
article reporting that household exposure to asbestos had been established as
potentially hazardous.  In Dr. Lemen=s opinion, this article confirmed
that end users of asbestos products and their family members could be at risk
due to asbestos exposure.  However, prior to this time period,








reports of asbestos
related disease occurring in non-occupationally exposed individuals had been
considered medical curiosities.[21]

Dr.
Lemen testified it was not until 1977, when Dr. Selikoff and his research
colleagues published AAsbestos Disease in Maintenance Workers of the Chemical
Industry@ that it became clear that, when
dealing with hazardous levels of household exposure, industry had to be
concerned not only with insulation workers but also with all employees working
in areas where asbestos might be handled.  Dr. Lemen also testified he was not
aware of any epidemiological studies of refinery workers before 1980 that
demonstrated  a doubling of the risk for asbestos related disease.  In
addition, Dr. Lemen stated that, even with all the advances in scientific
knowledge regarding the risks of asbestos exposure, by the time of the 2004
trial, there were still no epidemiological studies showing a doubling of the
risk for household asbestos exposures.

2.         Other Witnesses= Testimony Regarding Exxon=s Knowledge of the Risks of Asbestos.








James
Hammond, Exxon=s former Chief Industrial Hygienist and Director of Industrial Hygiene,[22]
testified that by 1961, it was common knowledge to Hammond that asbestos
exposure increased the risk of mesothelioma.[23] 
Hammond also testified that Exxon started an active search for alternative
products for asbestos in 1967.  According to Hammond, Exxon started this search
after Exxon learned it took less exposure to asbestos to cause mesothelioma
than it did to cause asbestosis.  Dr. Neill Weaver, Exxon=s medical director from 1964 until
1974, testified he learned in medical school in 1944 that asbestos caused
disease and could kill.[24]  He also
testified the association between asbestos and lung disease would not be
established among the scientific community until the early 1970's.  Dr. Raabe
testified that by 1977 even the skeptics accepted there was a causal
association between mesothelioma and asbestos exposure, but there was still no
epidemiological evidence of occurrence in refineries.  Dr. Raabe also testified
while there are anecdotal case reports, there had still been no epidemiological
studies of household asbestos exposure.  Finally, both Dr. Segarra and Dr.
Hammar testified that, at the time of trial, housewife bystander exposure to
asbestos causing mesothelioma was not a unique or new concept and was well
accepted in the medical community.

C.        Appellee=s Injury Was Not Foreseeable.

Appellee
argues that knowledge of a risk of harm to someone, creates a duty of care to
everyone. We disagree this is the law in Texas. The imposition of a duty on
Exxon to protect appellee from exposure to asbestos dust depends on the
foreseeability of the risk of injury to appellee or others similarly situated
from asbestos fibers carried home on her husband=s clothing. Mellon Mortgage, 5 S.W.3d  at 655.








As support for her contention that we erred in finding the
risk of harm to appellee was not foreseeable to Exxon until 1972, appellee
cites the recent New Jersey Supreme Court opinion in Olivo v.
Owens-Illinois, Inc., 895 A.2d 1143 (N.J. 2006), as well as the Beaumont
Court of Appeals 1998 opinion in Fuller-Austin Insulation Co. v. Bilder,
960 S.W.2d 914 (Tex. App.CBeaumont 1998, pet. granted, judgm=t vacated
w.r.m.).  Initially, neither case represents binding authority on this court.[25]

In Olivo, a summary judgment case, the New Jersey
Supreme Court determined Exxon owed a duty to workers on its premises for the
foreseeable risk of exposure to asbestos as well as a duty to spouses handling
workers= unprotected work
clothing based on the foreseeable risk of exposure from asbestos brought home
on that work clothing.[26] 
Olivo, 895 A.2d at 1149.  Appellee argues we should accept the result in
Olivo as the New Jersey Supreme Court Aconsidered the
same facts regarding duty and foreseeability, and the same facts about what
Exxon knew and when it knew it.@  However, the facts in Olivo are
not contained in our record, so it is impossible to confirm or deny whether the
facts in the two cases are the same.  The Olivo opinion does reveal at
least one significant difference in the facts of the two cases. The New Jersey
Supreme Court states: Aas early as 1916, industrial hygiene texts
recommended that plant owners should provide workers with the opportunity to
change in and out of work clothes to avoid bringing contaminants home on their
clothes.@  Id. 
There are no industrial hygiene texts from 1916 in this record or testimony
from any witness about an industrial hygiene text from 1916 detailing this kind
of warning.  For these reasons, we do not find the New Jersey Supreme Court=s Olivo decision
persuasive.








In Fuller-Austin, the plaintiffs[27]
sued a distributor of asbestos products pursuing a strict liability theory of
recovery.  Fuller-Austin, 960 S.W.2d at 917.  The Beaumont Court of
Appeals affirmed the judgment of the trial court holding that (1) recovery
under the strict liability doctrine is not limited to users and consumers, and
(2) Fuller had a duty to warn  the stepdaughter of the dangers of asbestos even
though she was not a user or consumer of the asbestos products.  Id. at
918, 920.  Because the case at bar is not a strict liability action, and Exxon
was a user and not a manufacturer or distributor of asbestos products, we find Fuller-Austin
distinguishable.  

In both of her motions for rehearing appellee argues that
Exxon had Aactual knowledge@ of the  take home
risk of asbestos by various case reports published in 1964.[28] 
Appellee=s reliance on case
reports is misplaced.  The Texas Supreme Court has discussed the scientific
reliability of case reports:

The FDA has promulgated regulations that detail the requirements for
clinical investigations of the safety and effectiveness of drugs.  These
regulations state that A[i]solated case reports, random
experience, and reports lacking details which permit scientific evaluation will
not be considered.@  Courts should likewise reject
such evidence because it is not scientifically reliable.

 








Merrell
Dow Pharmaceuticals, Inc. v. Havner, 953 S.W.2d 706, 720 (Tex. 1997)
(citations omitted).[29] 
As they are not scientifically reliable, case reports constitute no evidence
and cannot support a finding that the risk of harm to appellee was foreseeable
to Exxon as early as 1964.








In 1972, even though there were still mixed messages from
the medical and scientific community on the risks associated with asbestos
exposure and there was no clear consensus on that risk, OSHA prohibited
employers from allowing workers who had been exposed to asbestos to wear their
work clothes home.  Based on the evidence introduced during the trial, Exxon
did not become aware of the take-home risk of asbestos exposure until
that point.  As a result of the OSHA regulations, Exxon was put on notice in
1972 that asbestos posed a risk to persons, such as employee families, who were
never on the employer=s premises.  It follows that in 1972 the
risk to appellee of contracting a serious illness had become foreseeable,
triggering, for the first time, a duty to protect appellee and those persons
similarly situated.  However, by that time, Mr. Altimore was working in the
air-conditioned tool room and was no longer working in an environment where he
was being exposed to asbestos dust. Accordingly, we conclude as a matter of law,
Exxon did not owe a duty to appellee during the relevant time period referenced
in section IIIB above, and we sustain Exxon=s first issue on
appeal. Because resolution of this issue is dispositive of this appeal, we do
not address Exxon=s other issues.

Conclusion

Having found Exxon did not owe appellee a duty during the
relevant time period referenced in section IIIB above, we reverse the judgment
of the trial court and render judgment that appellee take nothing on her claim
against Exxon.

 

 

 

 

 

__________________________________

John S. Anderson

Justice

 

 

 

 

Judgment rendered
and Substitute Majority Opinion and Concurring Opinion on Rehearing filed April
19, 2007.

Panel consists of
Justices Anderson, Edelman, and Seymore. (Seymore, J., files a concurring).









[1]  As a result of the issuance of this new substitute
opinion, appellee=s Second Motion for Rehearing En Banc is overruled as
moot.





[2]  Dr. Jay Segarra, appellee=s pulmonologist expert witness, provided testimony
regarding the medically accepted causes of mesothelioma: (1) asbestos exposure;
(2) aeronite exposure in the nation of Turkey only; (3) therapeutic radiation
of the mediastinum, usually for Hodgkin=s
Disease; (4) severe pleural scarring; and (5) ideopathic, which means there is
no evidence of exposure to a substance known to cause mesothelioma, and thus
the cause in such cases is unknown. 





[3]  The corporate history of appellant was not entered
into evidence, but was explained by counsel to the jury. In 1911, both Standard
Oil of New Jersey and Humble Oil in Texas were formed. In 1919, Standard Oil
acquired some ownership interest in Humble Oil. In 1920, Humble Oil opened the
Baytown refinery. It began chemical operations at the refinery in 1940. In
1965, Enjay was formed and the chemical operations of Humble Oil were
transferred to Enjay. In 1972, Standard Oil changed its name to Exxon. Humble
Oil, Esso, and Enjay merged into Exxon during 1972 and 1973. In 1998, Exxon and
Mobil merged. Inasmuch as the parties both refer to Mr. Altimore=s employer during the entire time period relevant to
this litigation as Exxon, we shall follow their lead and refer to appellant as
Exxon or appellant.





[4]  Dr. Lemen possesses masters and Ph.D. degrees in
epidemiology.  Dr. Lemen served in the United States Public Health Service (AUSPHS@) from 1970
until his retirement in 1996.  Dr. Lemen rose to the rank of rear admiral in
the USPHS.  Dr. Lemen spent his career working in the area of
occupationally-related diseases and injuries.  Among his many accomplishments
during his service with the USPHS, Dr. Lemen served as Assistant Surgeon
General and Deputy Director of the National Institute For Occupational Safety
and Health (ANIOSH@).





[5]  No air samples from the Exxon Baytown facility were
entered into evidence.





[6]  Dr. Sam Hammar is a board certified pathologist.





[7]  Appellee settled with the other defendants in an
amount exceeding the actual damages found by the jury in the verdict against
Exxon.





[8]  A duty may also exist as a matter of law because of
a special relationship between the parties. Golden Spread Council, Inc. v.
Akins, 926 S.W.2d 287, 292 (Tex. 1996).  Because there was no allegation or
evidence that a special relationship existed between the parties, we need not
address this issue.





[9]  While Mellon Mortgage was a premises
liability case, the Texas Supreme Court specifically stated it was focusing on Ageneral foreseeability principles that limit the scope
of the defendant=s duty in this case.@  Mellon Mortgage Co. v. Holder, 5 S.W.3d 654, 655 (Tex. 1999)
(plurality opinion). 





[10]  While it does not impact our decision, there was
some disagreement in the record on when Mr. Altimore transferred to the
polyolefins unit.  Jesse Stovall testified Mr. Altimore moved in 1959, when the
polyolefins unit was new.  Roy Calma testified he went to work in the
polyolefins unit in 1966 and Mr. Altimore was already there working as a
machinist in the unit.  Bruce Larson, a retired Exxon industrial hygienist,
testified Mr. Altimore worked in the refinery until 1968, when he moved to the
polyolefins unit.  Appellee testified Mr. Altimore moved to the polyolefins
unit in 1971 or 1972.





[11]  Mr. Altimore died in 1992 from pulmonary problems
and heart failure.





[12]  While there was testimony regarding Mr. Altimore=s alleged asbestos exposure, there was also testimony
that: (1) you could not tell simply by looking, whether an insulation product
contained asbestos; (2) the Baytown workers referred to all insulation material
as asbestos; (3) Exxon used non-asbestos insulation products at the Baytown
facility; (4) the
polyolefins unit, because it operates at lower temperatures than the refinery,
used less asbestos containing insulation materials than the refinery; (5) much
of the work performed by Exxon machinists occurred in the machine shop and not
out in the various units; (6) visible dust does not always mean asbestos dust;
(7) the polyolefins unit emits a course white dust; and (8) appellee testified
the dust Mr. Altimore brought home on his clothing was this polyolefins dust.  





[13]  Asbestosis and mesothelioma are two separate
diseases, each caused by exposure to asbestos.  Asbestosis is a non-cancerous
scarring of the lung tissue caused by the inhalation of asbestos fibers.  As
more asbestos fibers are inhaled, the scarring of the lungs increases and
breathing capacity decreases.  If the scarring is severe enough, the disease
may prove fatal.  Mesothelioma is a rare and almost universally fatal form of
cancer where tumors develop in the serosal lining of the body cavities with
pleural mesothelioma being the most common.  With pleural mesothelioma the
tumors develop not in the lungs, but in the pleura lining the lungs.  The
tumors then spread in a diffuse manner into the surrounding areas of the body. 
Death usually occurs within nine to twelve months of diagnosis.





[14]  It was undisputed at trial that Exxon was a leader
of the petroleum industry in industrial hygiene and medical research and made
extensive efforts to stay abreast of advances in industrial hygiene and
medicine as they occurred.





[15]  According to Dr. Lemen, epidemiology is a
subcategory of public health that tries to understand why certain people get
disease, other people do not get disease and what are the causes of the
diseases that people get and ultimately how those diseases can be prevented. 
By its very nature, epidemiology has to wait until the disease or death occurs
before any statistics can be compiled.  An epidemiological study examines
existing populations in an effort to determine if there is any causal
association between a disease or condition and a factor suspected of causing
that disease or condition.  Merrell Dow Pharm., Inc. v. Havner, 953
S.W.2d 706, 715 (Tex. 1997).  An anecdotal case report or case study is not an
epidemiological study; it is a report that a certain person has a particular
disease.  The case study will give a great deal of background information about
that individual.  The case studies are published so that doctors and other
professionals will read them and report if they have encountered a similar
situation.  If enough case studies are published reporting similar factual
situations, this may lead to an epidemiological study to investigate if there
is a causal association between the exposure and a particular disease.





[16]  E.R.A.
Merewether & C. W. Price, Report on Effects of Asbestos Dust on the Lungs
and Dust Suppression in the Asbestos Industry (London, H.M. Stationary
Office 1930).  Merewether and Price studied asbestos textile workers in Great
Britain.  They concluded that asbestos exposure caused asbestosis.  They also considered
workers other than in the manufacturing areas and concluded that asbestos
exposure at the same levels would be a hazard to those workers using asbestos
products as well.  Merewether and Price concluded that workers should be given
a Asane appreciation of the risk,@ because of the danger that, if the workers do not
understand the risks associated with asbestos, they are less likely to take
precautions to protect themselves.





[17]  S. Roodhouse Gloyne, Two Cases of Squamous
Carcinoma of the Lung Occurring in Asbestosis,  Tubercle 5, 5-10 (1935) (Gr. Brit.).  Dr. Gloyne reported two
persons with non-fatal asbestosis who developed carcinoma of the lung.  Dr.
Gloyne=s study focused on workers in the asbestos textile
manufacturing industry.  That same year, in the United States, researchers Lynch
and Smith published similar findings.   





[18]  United States
Public Health Service, Effects of the Inhalation of Asbestos Dust on the Lungs
of Asbestos Workers (1935).   In addition, Dr. Dreessen of the USPHS
conducted a study of asbestos textile workers along the eastern coast of the
United States and published his study in 1938.  His recommended exposure level
came out of this study.





[19]  The authors of this report were C. Berry, Ph.D.;
J.W. Hammond, M.S.; R. S. Bonsib, E.M.; and N.V. Hendricks, M.S.





[20]  Report from R.E. Eckardt, Exxon medical research
department employee, to Exxon Corp., Esso Research and Engineering Company
Summary of the Conference of Biological Effects of Asbestos (Oct. 1964).





[21]  Irving J. Selikoff et al., Asbestosis Among
Household Contacts of Asbestos Factory Workers, 1979 Annals N.Y. Acad. Of Sci. 387. 





[22]  James Hammond started working at Exxon in 1947 and
he served as the industrial hygienist at Exxon=s Baytown facility.  He retired in 1978.  James Hammond is not to be
confused with Dr. E. C. Hammond an epidemiologist with the American Cancer
Society.  Mr. Hammond is deceased, but he testified at trial via videotaped
deposition.





[23]  While Mr. Hammond may have considered this
information common knowledge it was not because the association between
asbestos exposure and mesothelioma was not a commonly known, easily
ascertainable and indisputable fact in 1961.  See Evans Associated Indus.,
Inc. v. Evans, 493 S.W.2d 547, 548 (Tex. Civ. App.CHouston [1st Dist.] 1973, writ dism=d) (stating, in judicial notice setting, common
knowledge consists of facts of public notoriety and indisputable existence); Buckaroo
Trucking Co. v. Johnson, 409 S.W.d 911, 913 (Tex. Civ. App.CCorpus Christi 1966, no writ) (stating, in judicial
notice setting, common knowledge consists of commonly known, easily
ascertainable and indisputable facts).  The evidence in this case demonstrates
that, in 1961, many aspects of the relationship between asbestos and
mesothelioma were in dispute and would be for quite some time.  





[24]  Dr. Weaver served as the medical director of Exxon=s Baton Rouge refinery from 1956 until 1964, when he
became Exxon=s medical director.





[25]  The fact the Fuller-Austin opinion is not
binding on this court is confirmed by the subsequent history. When the Texas
Supreme Court grants a petition for review, sets aside the judgments of the
court of appeals and trial court without reference to the merits of the case,
and does not set aside the court of appeals=
opinion, the weight of authority for that opinion is the same as if the
petition for review had been dismissedBthe
Texas Supreme Court has not addressed the merits of the case. James Hambleton, Notations
for Subsequent Histories in Civil Cases, 65 Tex. B. J. 694, 698 (2002).





[26]  While the New Jersey Supreme Court did find that
Exxon owed a duty, it remanded the case to the trial court as there were
genuine issues of material fact about the extent of the duty Exxon owed,
whether any exceptions to that duty applied, and whether Exxon satisfied that
duty.  Olivo v.
Owens-Illinois, Inc.,
895 A.2d 1143 (N.J. 2006). 





[27]  The plaintiffs were the stepdaughter of an
insulation installer and her husband.  Fuller-Austin Insulation Co. v. Bilder, 960 S.W.2d 914, 917 (Tex. App.CBeaumont 1998, pet. granted, judgm=t vacated w.r.m.). The plaintiffs alleged the stepdaughter was exposed
to asbestos dust from Fuller=s products that
the stepfather brought home on his work clothes.  Id. 





[28]  Throughout her second motion for rehearing, appellee
uses the terms Acase study@
and Aepidemiological study@ interchangeably, suggesting they are one and the same.  They are not. 
We have summarized the differences in note 15, supra.





[29]  In her second motion for rehearing, appellee argues
that by citing Havner as support for requiring reliable scientific
evidence to establish the foreseeability element of duty, we improperly
conflated duty and proximate cause.  As we do not reach the issue of proximate
cause, Havner=s proximate
cause analysis is not relevant here.  However, we do cite Havner, even
though Havner directly addressed the issue of causation, for the
proposition that an anecdotal case study or report establishes only that a
person has become sick and is not scientifically reliable.  Even though Havner
addresses causation,  Havner=s discussion of the
scientific reliability of case studies or reports is applicable to the duty
issue in this case as the foreseeability analysis is the same for both duty and
proximate cause.  Mellon Mortgage, 5 S.W.3d at 659 (stating courts  may
rely upon law that establishes a foreseeability standard that applies to both
duty and proximate cause because the standards are the same); Longoria v.
Graham, 44 S.W.3d 671, 673 n.3 (Tex. App.CHouston [14th Dist.] 2001, no pet.) (stating foreseeability analysis is
the same for duty and proximate cause).  Even if the Supreme Court had not
determined that the foreseeability analysis is the same for both duty and
proximate cause, it would be especially appropriate to apply the scientific
reliability rule announced in Havner to toxic tort casesBcases which require scientific evidence to determine
whether an injury is even possible.  It would make little sense to require
scientifically reliable evidence for the proximate cause element of a
negligence claim but allow unreliable scientific evidence to establish the
existence of a legal duty, the threshold inquiry in a negligence case. 
Instead, the rule must be, that whenever scientific evidence is required to
establish any element of a cause of action, that evidence must be
scientifically reliable. See Havner, 953 S.W.2d at 728 (stating Athe law should not be hasty to impose liability when
scientifically reliable evidence is unavailable@).